UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| CHRISTINA MINK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-561-SEB-JMS |
| | ) | |
| BARTH ELECTRIC CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment

[Docket No. 45], filed on July 2, 2009, pursuant to Federal Rule of Civil Procedure 56

and Local Rule 56.1.  Plaintiff, Christina Mink, asserts this claim against her former

employer, Defendant, Barth Electric Co., Inc. ("Barth"), for its allegedly discriminatory

actions towards her based on her sex, including subjecting her to a hostile working

environment, and for allegedly retaliating against her for engaging in protected activity,

all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e *et seq*.  For the reasons detailed below, we <u>GRANT</u> Defendant's Motion for

Summary Judgment.[1]

---

[1] On September 15, 2009, Defendant filed a Motion to Strike the Combined Affidavit of
Greg Sidell, M.D. and Debbie Reuter [Docket No. 57].  Because, for the reasons detailed below,
we need not rely upon the information contained in that affidavit in rendering our ruling, we
<u>DENY AS MOOT</u> Defendant's Motion to Strike.

**Factual Background**

  Barth is a family-owned and family-operated electrical contractor headquartered in Indianapolis, Indiana, that serves both commercial and residential customers.  Ms. Mink entered Barth's electrician's apprenticeship program in June of 1999 and was employed at Barth for approximately six years thereafter as a union electrician.  During that time, Ms. Mink worked at more than twelve job sites, and her longest period of employment at any single job site was at the Circle Center Mall ("the Mall"), located in downtown Indianapolis.  Ms. Mink worked at the Mall for slightly more than two years, from February 2005 to April 2007, her final two years of employment with Barth.  Throughout her employment with Barth, Ms. Mink received high marks on each of the progress reports completed by her supervisors.  See Pl.'s Exh. 1.

  When she worked at the Mall, Ms. Mink's foreman was Steve Carpenter, who reported to Field Superintendent Doug Arthur and Contract Manager Steve Owen.  Mr. Arthur met with Mr. Carpenter approximately eight to twelve times per year for oversight and coordination purposes, but they never worked together on a day-to-day basis. Deposition of Douglas Arthur ("Arthur Dep.") at 33-34; Deposition of Steve Carpenter ("Carpenter Dep.") at 26.  Mr. Arthur and Mr. Owen both reported directly to Barth's President, Mike Barth III.  Def.'s Interog. Ans. No. 3.  As a foreman, Mr. Carpenter's job responsibilities included ordering materials, ensuring that the work was executed correctly, and supervising apprentices as well as journeymen.  Carpenter Dep. at 28-29. The only other Barth employee who worked directly with Ms. Mink and Mr. Carpenter at

the Mall during the time the events occurred which culminated in this litigation transpired
was Max Davis.

**Background Information on the Apprenticeship Program**

The electrician's union apprenticeship program in which Ms. Mink was enrolled
included five years of required training.  For the first two years, participants were
required to perform forty hours of work on the job each week, plus attend a training
session every other Saturday.  During the second and third year, the schedule changed to
one day of classroom work every other week during the work week.  Throughout the third
year, apprentices were also required to attend classes every Saturday until they completed
the required credits to receive an AAS degree.  Affidavit of Christina Mink ("Mink Aff.")
¶ 1.

Ms. Mink states that the training was very intense, both physically and mentally.
Although she spent a significant amount of time in the classroom, the vast majority of her
training came from on-the-job experience received while working with journeymen
electricians at various job sites.  Ms. Mink testified by affidavit that it was necessary for
her to practice her skills every day so that the procedures involved in performing the
required tasks became second nature to her.  Working with live electricity requires
confidence, which Ms. Mink testified is gained by repetitively performing tasks.
According to Ms. Mink, during the five years of training she was supposed to be exposed
to a wide variety of situations and have the opportunity to continually practice the

techniques she was learning so that she could perfect the procedures.  Id. ¶¶ 2-3.


**Plaintiff's Allegations of Sexual Harassment and Retaliatory Behavior**

During the time that Mr. Carpenter was her foreman, Ms. Mink testified by affidavit that in contrast to the expected learning process she "was exposed to the opposite of apprenticeship training," that her "learning stopped" and was instead treated like Mr. Carpenter's "pet, or a mule, and was expected to follow him around, stand behind him and not ask questions."  Id. ¶ 4.   According to Ms. Mink, this treatment worsened in the fall of 2006 and occurred in retaliation "for fighting him off, or telling him off, or not going along with his games."  Id.  Ms. Mink contends that Mr. Carpenter would "physically wrench" ladders and other heavy objects she was carrying, pinch her "hard enough to leave bruises," and send her off on "gofer" errands back and forth between the material room and the job site, which at times were up to a mile apart.  Id.; Mink Dep. at 50.  Ms. Mink contends that she began to complain to Mr. Carpenter that she had effectively "stopped being an electrician" because she was unable to practice her skills because he would not give her the work.  Mink Aff. ¶ 4.  She also expressed her concern to her co-worker, Max Davis, that she would lose all of the electrician's skills she had learned during her apprenticeship, if Mr. Carpenter kept assigning her tasks that were unrelated to her training.  Id.; Davis Dep. at 39.

Following her complaints, Ms. Mink claims that Mr. Carpenter began to put her into dangerous situations for which she was neither prepared nor capable of performing,

4

either because of her lack of recent hands-on electrical work or because of her small physical size.  For example, in December of 2006, Mr. Carpenter sent Ms. Mink to work on live 277-volt lighting despite allegedly being told by his supervisors not to perform such work with live current.  Mink Dep. at 275-76.  Ms. Mink asserts that Mr. Carpenter knew she was not equipped to perform such a task because her skills had atrophied due to lack of use and that he was merely punishing her for complaining.  Mink Aff. ¶ 5.  Ms. Mink ended up receiving a serious cardiac shock.  Mr. Carpenter instructed her to go home and put ice on her injured arm, but she chose to seek treatment at the emergency room.  Mink Dep. at 276.

As a result of the electrocution, Ms. Mink was required to wear a sling to support her arm.  However, she contends that Mr. Carpenter told her that the sling would embarrass Barth and that she should remove the sling and put her hand in her pocket to support her arm.  On that same day, Ms. Mink claims that after lunch she was in a secluded stairway in the parking garage and Mr. Carpenter attacked her.  Ms. Mink testified by deposition that she ended up down on her knees, yelling, "What the hell are you doing?  I'm one-armed," to which Mr. Carpenter allegedly replied, "I know, that's the point."  Id. at 46.  Ms. Mink further testified that, on another occasion, Mr. Carpenter intentionally shook a twelve-foot ladder on which Ms. Mink was standing that was even more precarious by virtue of being on top of a platform twenty to thirty feet in the air.  Id. at 51.  In her deposition, Ms. Mink testified that Mr. Carpenter once came up behind her while she was working on an exposed panel with live electricity, grabbed her, and

5

pretended like he was going to push her into the panel.  Id. at 71.  Ms. Mink alleges that, on a separate occasion, she was on the roof of a building and Mr. Carpenter grabbed her by the shirt and pretended that he was going to throw her off of the roof.  Id. at 73.

During the fall of 2006, Ms. Mink contends Mr. Carpenter's sexual harassment increased in quantity and severity.[2]  According to Ms. Mink, since the spring of 2005, Mr. Carpenter had periodically touched or tickled her on the leg, pinched her thighs, or poked her in the ribs with ceiling wire, while she would be working on the upper rungs of a ladder.  She had mentioned this behavior to her co-worker, Mr. Davis, who told her that Mr. Carpenter did similar things to him as well.  Mink Dep. at 7-11.  Ms. Mink alleges that, beginning in the fall of 2006, Mr. Carpenter's harassment became worse.  Ms. Mink contends that, at that point, Mr. Carpenter began to pin her to her desk and put his hands inside her bra.  Ms. Mink testified that this behavior occurred on approximately fifty occasions during her employment with Barth.  Id. at 33-35, 42.  She also alleges that Mr. Carpenter wrestled her to the ground on two occasions.  Id. at 205.  In April 2007, after she had asked him to stop harassing her, he allegedly refused to let her eat lunch or have any break periods.  Id. at 244, 290-91.  According to Ms. Mink, "If you in any way did what [Mr. Carpenter] didn't want you to do, he made you pay.  I mean, you had to answer for it."  Id. at 48.

---

[2] Ms. Mink contends that Mr. Carpenter started sexually harassing her in the spring of 2005, a few months after she was transferred to the position at the Mall.  Mink Dep. at 8.

6

**Plaintiff's Complaints to Defendant**

On Friday, April 13, 2007, according to Ms. Mink approximately two years after

Mr. Carpenter first began harassing her, Ms. Mink telephoned Barth's EEO Officer,

Teresa Fahrbach, and reported that Mr. Carpenter was subjecting her to "outrageous

behavior."  Affidavit of Teresa Fahrbach ("Fahrbach Aff.") ¶ 4.  When Ms. Fahrbach

asked what she meant, Ms. Mink responded that she had been missing a lot of work and

Mr. Carpenter had been covering for her, but that he told her that he had control over

whether she kept her job.  Ms. Mink also stated that she believed Mr. Carpenter to be

dangerous and that he had come up behind her and put his hands down her shirt, would

tickle her from behind when she was working on an open electrical panel, and would

sometimes shake the ladder while she was standing on it.  Id. ¶¶ 6-7.  Ms. Mink told Ms.

Fahrbach that no one else had witnessed these incidents, but that her co-worker, Mr.

Davis, the only other Barth employee who worked at the Mall, could describe similar

incidents which he experienced with Mr. Carpenter.

In that conversation, Ms. Mink inquired as to her options.  She told Ms. Fahrbach

that she had had previous trouble with Barth when she complained on two prior occasions

of inappropriate behavior at other job sites that did not involved Mr. Carpenter.  Ms.

Mink informed Ms. Fahrbach that, after she made her first complaint, Barth moved her

from her "nice job" to a position at a wastewater treatment plant, which she believed was

punishment for complaining.  On another occasion at a different job site, when she

complained that a co-worker had tried to kiss her, Ms. Mink reported that she heard her

7

foreman say to another employee that he was "getting rid of trouble," and she was then transferred that same day.  Id. ¶¶ 9-10.  According to Ms. Mink, it was these experiences, coupled with her fear that Mr. Carpenter controlled whether she kept her job, that prevented her from reporting his harassing behavior earlier.

Ms. Fahrbach told Ms. Mink that Barth would conduct an immediate investigation into her complaints and assured her that, if necessary, the company could move her (Mink) away from the Mall to a comparable job site.  Id. ¶ 11.  Ms. Mink then listed various reasons why she liked working at the Mall.  First, she explained that she had bladder problems which required her to be somewhere with a readily available bathroom, and that she liked the Mall because she did not have to use a port-a-potty there.  Ms. Mink expressed that she also liked the Mall because it was relatively close to her home southwest of Indianapolis and that she did not want to be transferred to Carmel or some other similarly inconvenient location.  Finally, she stated that the Mall was an ideal location for her because it was inside, in a climate-controlled environment, which did not exacerbate her severe allergies.  Id. ¶¶ 12-14.

At that point in the conversation with Ms. Fahrbach, Ms. Mink again asked what her options were and stated that she was having panic attacks and needed time off.  Ms. Fahrbach informed Ms. Mink that she was entitled to take twelve weeks of unpaid leave per year under the Family and Medical Leave Act ("FMLA").  Ms. Fahrbach stated that she would determine what documentation Ms. Mink would need to complete to take FMLA leave and get back to her.  Id. ¶¶ 15-16.  A few hours later, Ms. Mink telephoned

Ms. Fahrbach a second time to inquire about the FMLA paperwork.  Ms. Fahrbach

informed Ms. Mink that, if she (Mink) wanted to take leave, she simply needed to inform

Barth's payroll administrator.  Ms. Fahrbach also stated that Barth was very busy and had

plenty of work available and assured Ms. Mink that the company could work with her to

provide part-time or flex-time work until she felt she was ready to return full time.

     As an additional option, Ms. Fahrbach said that Ms. Mink could work in the pre-

fabrication department in the warehouse at Barth's headquarters if she wanted, which was

inside, climate controlled, and had bathrooms instead of port-a-potties, as Ms. Mink

required.[3]  At the end of the conversation, Ms. Mink informed Ms. Fahrbach that she

(Mink) would not be in on Monday, but that she had not yet made a decision regarding

FMLA leave.  Ms. Fahrbach said that she would call Ms. Mink the following week after

investigating the allegations of harassment.  Id. ¶¶ 18-19, 21.


**Defendant's Investigation of Plaintiff's Allegations**

     Immediately following her first telephone conversation with Ms. Mink, Ms.

Fahrbach assembled Mr. Barth and Mr. Arthur (field superintendent and Mr. Carpenter's

direct supervisor) to review Ms. Mink's complaint.  On April 16, 2007, the following

Monday, Ms. Fahrbach commenced an investigation.  She, along with Mr. Barth, met

---

    [3] Another Barth employee, Bibiana Phillips, testified by deposition that the warehouse is
usually a location where an electrician who was injured or unable to work fully at a job site
would be assigned.  The position would entail unloading trucks, putting away stock, and
completing prefab assembly work.  Deposition of Bibiana Phillips ("Phillips Dep.") at 40-41.

with Mr. Carpenter at the Mall.  Ms. Fahrbach informed Mr. Carpenter that Ms. Mink had made certain allegations, but did not specify what those were, and then asked if there was anything that had happened that Mr. Carpenter wanted to explain.  Mr. Carpenter said he could not think of anything except that Ms. Mink had been missing a significant amount of work and that he had informed her the previous week that he would no longer be able to cover for her absences.  Fahrbach Aff. ¶¶ 22-23.

Ms. Fahrbach then told Mr. Carpenter about Ms. Mink's specific accusations, including the ladder and tickling incidents as well as the allegation that he had attempted to put his hand down Ms. Mink's shirt.  According to Ms. Fahrbach, Mr. Carpenter had a visible reaction to the allegations and denied them, insisting that there had never been any inappropriate behavior between them on either side.  He stated that he felt he was doing Ms. Mink a favor by covering for her poor attendance, but that Mr. Arthur had recently talked to him about it and so he had started to save the voicemail messages left by Ms. Mink in which she would call to explain why she could not work.[4]  Mr. Carpenter then played the voicemail messages for Ms. Fahrbach and Mr. Barth.[5]  Id. ¶¶ 24-25.

After listening to the voicemails, Ms. Fahrbach asked Mr. Carpenter to leave so

---

[4] In his deposition, Mr. Arthur testified that Mr. Carpenter never brought Ms. Mink's attendance issues to his (Arthur's) attention.  Arthur Dep. at 24-25.

[5] Ms. Mink telephoned Mr. Carpenter on March 22nd at 4:37 a.m., March 27th at 4:50 a.m., March 28th at 4:26 a.m., April 9th at 1:02 a.m., and April 11th at 11:45 p.m. to notify him that she would be unable to work for various reasons, such as migraines, allergies, insomnia, or because she had taken too much Valium.  See Def.'s Exh. 3.  Ms. Fahrbach testified by affidavit that in each of the voicemails, Ms. Mink's voice was "garbled and semi-coherent."  Fahrbach Aff. ¶ 25.

that they could interview Mr. Davis, the only other Barth employee who worked at the

Mall with Mr. Carpenter and Ms. Mink.  Ms. Fahrbach asked Mr. Davis if he knew of any

"trouble" between Mr. Carpenter and Ms. Mink and Mr. Davis replied that he knew Ms.

Mink got annoyed by Mr. Carpenter's behavior.  He relayed that Mr. Carpenter was a

"jokester" who often engaged in horseplay on the job, such as pinching employees,

including Mr. Davis himself, on the leg while on a ladder.  Id. ¶ 26.  When asked if he

believed there was any sexual harassment by Mr. Carpenter towards Ms. Mink, Mr. Davis

described two incidents in which Ms. Mink, not Mr. Carpenter, had made sexual

references or jokes.[6]  On one occasion, Ms. Mink made a sexually-charged comment

about a length of wire and on another occasion, when either Mr. Carpenter, Mr. Davis, or

Ms. Mink was wearing knee pads on the job, Ms. Mink commented, "I've used a lot of

these in my day."  Id. ¶ 27.

Based on their investigation, Ms. Fahrbach and Mr. Barth concluded that Ms.

Mink's report was not believable and that Mr. Carpenter had not engaged in any wrongful

or unlawful conduct.  The next day, on Tuesday, April 17, 2007, Ms. Fahrbach

telephoned Ms. Mink and told her of the company's findings.  According to Ms. Mink,

---

[6] Mr. Davis testified by deposition that Ms. Mink never complained to him about Mr. Carpenter making serious sexual advances toward her, such as sticking his hand down her shirt or asking to have sex with her, but that the three of them did joke around and occasionally talked about sex.  Deposition of Max Davis ("Davis Dep.") at 37-39.  Mr. Davis also stated that, like Ms. Mink, he would get frustrated with Mr. Carpenter's horseplay around the job site.  For example, on a few occasions, while Mr. Davis was working on a ladder, Mr. Carpenter put his hand up Mr. Davis's pant leg, just as Ms. Mink alleged he had done to her.  Id.  Mr. Davis confirmed that Ms. Mink had told him that she was concerned that she was going to forget everything she had learned during her apprenticeship.  Id. at 39.

during that conversation Ms. Fahrbach told her that it was a "he-said she-said case" and
that Mr. Carpenter "is the one with all the job information; I can't just get rid of him."
Attachment to EEOC Charge.  Ms. Fahrbach reiterated that Ms. Mink could take as many
as twelve weeks of FMLA leave, if necessary, and that she could return to work at a
different jobsite, if she no longer felt comfortable working at the Mall with Mr.
Carpenter.  Fahrbach Aff. ¶¶ 29-30.


**Defendant's EEOC Policies and Reporting Mechanism**

Barth has an EEO policy in place a copy of which is given to all new employees
when they attend orientation and is posted at each Barth job site, including at the Mall.
The version of that policy in effect at the time of Ms. Mink's departure in 2007 provides
that Barth's decisions with regard to "[h]iring, training, compensation, promotion,
termination and layoff [are] handled without regard to race, color, religion, sex, national
origin, handicap, veteran status, or any other non-job related characteristics."  Def.'s Exh.
J (EEO Statement).  All Barth employees also receive a copy of the company's Policy
Working Rules, which summarize the rules applicable to employees and warn that
violation of any of the rules may be cause for dismissal.  Rule 11 of the Company Policy
Working Rules advises: "Employees shall maintain a working environment that is free
from harassment and intimidation of minority and female workers."  Both Ms. Mink and
Mr. Carpenter received copies of these policies and guidelines.

Barth also has a published reporting mechanism for harassment and discrimination

12

which was in place at the time the events transpiring in this litigation occurred.  If a Barth

employee feels that he or she has been the subject of harassment or discrimination, the

employee is encouraged to immediately notify either Mr. Barth (the company's

president), Mr. Arthur (field superintendent), or Ms. Farbach.  Barth provides the

telephone numbers of all three of these individuals as well as Ms. Farbach's email

address.  Ms. Mink concedes that she was aware of the reporting procedure but admits

that she never used it to notify Barth about any of Mr. Carpenter's alleged conduct until

2007, approximately two years after she maintains that the inappropriate, harassing

behavior began.  According to Ms. Mink, she did not immediately report Mr. Carpenter's

alleged harassment because she thought the situation would improve and she did not want

to risk getting transferred for complaining, as she felt had happened when she reported

harassment at previous Barth job sites.  Mink Dep. at 17-18, 25-31, 81-82.

In addition to posting the EEO policies and reporting procedures, Mr. Arthur

periodically visited each Barth job site to reiterate this information.  Arthur Dep. at 43-44.

On August 4, 2006, he made such a visit to the Mall to review the company's EEO

policies with Mr. Carpenter, Mr. Davis, and Ms. Mink.  Although this gave Ms. Mink an

opportunity to indicate any concerns regarding the EEO policies or their implementation,

she made no report regarding any sexual harassment or other problems with Mr.

Carpenter.  See Def.'s Exh. M (Job Visitation Report).  Ms. Mink contends that she did

not report Mr. Carpenter's behavior to Mr. Arthur because at that time the harassment

was only sporadic and did not intensify until the fall of 2006.  She also claims that she

13

does not recall Mr. Arthur's visit.

In September 2006, the Office of Federal Contract Compliance Programs ("OFCCP") conducted a random compliance audit at Barth to determine the company's compliance with federal laws "covering non-discrimination and affirmative action employment as it relates to minorities, women, veterans and individuals with disabilities." Def.'s Exh. N (Letter from OFCCP).  During the audit, the OFCCP investigator interviewed various Barth employees, including Ms. Mink, regarding topics such as equal employment opportunity, discrimination, and harassment to ensure that the company was in compliance with its EEO obligations.  Ms. Mink claims that she did not report Mr. Carpenter's behavior during her interview with the OFCCP investigator because she knew Barth would find out about it, but that she did say something like "sometimes as a woman there's a lot you got to put up with to keep your job and you can't always be raising your hand and making a spectacle of yourself."  Mink Dep. at 253-55.

**Plaintiff's Complaints Regarding Defendant's Investigation**

Ms. Mink contends that Barth failed to conduct an adequate investigation into her allegations.  She complains that Ms. Fahrbach and Mr. Barth interviewed Mr. Carpenter and Mr. Davis in public at a coffee shop table at the Mall, rather than in a private setting. Ms. Mink also claims that Ms. Fahrbach was "skeptical and not nice from the get-go" and "clearly aggravated."  Mink Dep. at 260, 270.  According to Ms. Mink, Barth never allowed her to tell her whole story or explain the voicemail messages that Mr. Carpenter

14

played for Ms. Fahrbach.  Ms. Mink contends that Barth's investigation was only cursory because Mr. Carpenter was a very valuable employee.

Finally, Ms. Mink asserts that, because her interview lasted only twenty minutes, it was "never elicited from her" that she had a record of various emails exchanged between Mr. Carpenter and herself, some of which address Mr. Carpenter's harassment.  For example, on April 18, 2006, in an email to Mr. Carpenter, Ms. Mink explained that work at Barth was stressful "[n]ot because of what I do, but because of the inappropriate, unwelcome, touching, groping, wrestling, pinching, fondling and suggestions that I[']m exposed to daily."  Pl.'s Exh. 6.  On March 27, 2007, Ms. Mink sent another email to Mr. Carpenter, stating: "I know you like to have fun at work, and I like that about you, but ... well ... please, I've asked before without much effect, but I[']m begging you now, please stop grabbing me and shoving your hands down my shirt."  Id.  Ms. Mink maintains that, if Ms. Fahrbach had conducted a longer interview, she (Fahrbach) would have discovered these communications.

**Plaintiff's FMLA Leave and EEOC Charge**

Ms. Mink elected to take FMLA leave beginning on April 9, 2007, and had no further contact with Barth until June of 2007, when she filed her charge of discrimination with the EEOC.  Around that same time, Barth made several attempts to contact Ms. Mink to inform her that her leave period was expiring and to inquire whether she planned to return to work or choose to take a termination, but the company could not reach Ms.

15

Mink by telephone and she did not respond to emails.  Phillips Dep. at 51-52; Def.'s Exh.

7.  Ms. Mink testified by deposition that she was not using her computer frequently at that

time, so she does not remember receiving an email, nor does she remember receiving a

telephone call from Barth.  Mink Dep. at 308-309.  Because Barth did not receive any

notification from Ms. Mink, upon expiration of her FMLA leave on June 29, 2007, Barth

converted her leave to a voluntary termination.

　　　In her EEOC charge, Ms. Mink levels a number of additional, more serious

accusations against Mr. Carpenter that she did not report to Barth.  She contends that she

suffered hundreds of incidences of sexual abuse over the two-year period between 2005

and 2007, which led to "severe loss of sleep, migraines, vomiting, panic attacks,

spontaneous bouts of crying, loss of normal hygiene, absentmindedness, numbness in

[her] extremities, and isolation from [her] friends and family."  EEOC Charge.  In a

fourteen-page attachment to her EEOC charge, Ms. Mink alleges that Mr. Carpenter:

routinely stuck his hand up her pant leg and grabbed her calf or pinched her thighs while

she was on a ladder; yanked her shirt collar to the side or down so that he could see the

color of her bra every day; came up behind her and tried to pull her shirt up when they

were rewiring a hotel room together; and followed her home one day after work.

Attachment to EEOC Charge.

　　　Ms. Mink further alleges that, beginning in July 2006, every day at the end of the

workday, Mr. Carpenter would come up behind her and stick his hands down her shirt

and inside her bra.  According to Ms. Mink, he would say, "You want to be part of the

16

team don't you?  Just sit still.  I want to say hi to the girls.  It will only take a second.

Now quit fighting me."  Id.  In her EEOC attachment, Ms. Mink further alleges that,

throughout the summer and fall of 2006, Mr. Carpenter made "many, many remarks about

[her] performing oral sex on him."  Id.  However, it is undisputed that Ms. Mink never

reported any of these allegations to Barth before filing her EEOC charge.


**The Instant Litigation**

In June 2007, Ms. Mink filed her charge of discrimination with the EEOC.  On

February 1, 2008, she received her Notice of Right to Sue.  On April 29, 2008, Ms. Mink

filed her Complaint in this action, alleging that she was sexually harassed, forced to

endure a hostile work environment, constructively terminated, and retaliated against for

raising these issues with Barth.


## Legal Analysis

### I.      Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material

17

fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary

18

judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v.

AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one

essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at

323.

      A plaintiff's self-serving statements, which are speculative or which lack a

foundation of personal knowledge, and which are unsupported by specific concrete facts

reflected in the record, cannot preclude summary judgment.  Albiero v. City of Kankakee,

246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999);

Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

      The summary judgment standard is applied rigorously in employment

discrimination cases, because intent and credibility are such critical issues and direct

evidence is rarely available.  Seener v. Northcentral Technical Coll., 113 F.3d 750, 757

(7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996).  To that

end, we carefully review affidavits and depositions for circumstantial evidence which, if

believed, would demonstrate discrimination.  However, the Seventh Circuit has also made

clear that employment discrimination cases are not governed by a separate set of rules,

and thus remain amenable to disposition by summary judgment so long as there is no

genuine dispute as to the material facts.  Giannopoulos v. Brach & Brock Confections,

Inc., 109 F.3d 406, 410 (7th Cir. 1997).


**II.      Hostile Work Environment**

Ms. Mink submits that she not only suffered harassment amounting to a hostile work environment, but that that hostile work environment resulted in her constructive discharge, both in violation of Title VII.  Title VII provides: "[i]t shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986), the Supreme Court clarified that the "terms, conditions, or privileges of employment" provision in Title VII encompasses *environmental* conditions of employment, and that the scope of the prohibition "is not limited to 'economic' or 'tangible' discrimination."  Id. at 64.  Therefore, a plaintiff may establish a violation of Title VII by proving that discrimination based on a protected class has created a hostile or abusive work environment.

In order to show that she was subjected to a hostile working environment because of her sex, Ms. Mink must demonstrate that: (1) she was subject to unwelcome harassment; (2) the harassment was based on sex; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability.  Williams v. Waste Mgmt. of Ill., 361 F.3d 1021, 1029 (7th Cir. 2004) (citations omitted).  Barth appears to concede for purposes of its summary judgment motion that Ms. Mink suffered unwanted harassment based on sex and that, viewing the facts in the light most favorable

20

to Ms. Mink as we are required to do at this stage of this litigation, there is at least a genuine issue of material fact regarding whether Mr. Carpenter's conduct was so severe or pervasive as to establish an actionable hostile environment.  Even so, Barth contends that it is entitled to summary judgment on Ms. Mink's hostile environment claim because she is unable to demonstrate any basis for employer liability.

An employer's liability for hostile environment sexual harassment depends upon whether the alleged harasser is the plaintiff's supervisor or a co-employee.  Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1998) (citations omitted).  Here, Barth does not dispute that Mr. Carpenter was Ms. Mink's supervisor as that term is defined for purposes of Title VII.  The Supreme Court has held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).  The employer is strictly liable if the supervisor's harassment results in a tangible employment action, because such an action is essentially "an official act of the enterprise, a company act."  Id. at 762, 765; accord Faragher v. Boca Raton, 524 U.S. 775, 807-808 (1998).  Examples of tangible employment actions include, *inter alia*, "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Ellerth, 524 U.S. at 761.

When no tangible employment action is taken against the employee in the course of the harassment, an employer may raise an affirmative defense to liability.  Id. at 765;

21

Faragher, 524 U.S. at 807.  In such cases, to avoid liability, the employer must show by a preponderance of the evidence that: (1) it took reasonable measures to prevent and promptly correct any sexually harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of preventive or corrective opportunities or to avoid harm otherwise.  Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807.  The Supreme Court has held that when, as here, the plaintiff also asserts a constructive discharge claim, an employer can raise this affirmative defense, unless the plaintiff quit "in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions."  Pennsylvania State Police v. Suders, 542 U.S. 129, 134 (2004).

Barth contends that Ms. Mink has failed to show either that Mr. Carpenter's conduct culminated in a tangible employment action against her or that her constructive discharge, if she was in fact constructively discharged, was of the type that should subject Barth to strict liability.  Thus, Barth contends that it is entitled to assert the Ellerth/Faragher affirmative defense in response to Ms. Mink's claims.  We address these issues in turn below.

### A.    Tangible Employment Action

A tangible employment action is "the means by which the supervisor brings the official power of the enterprise to bear on subordinates."  Ellerth, 524 U.S. at 762.  Such

actions constitute "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  Id. at 761.  While in many cases, a tangible employment action "inflicts direct economic harm," (id. at 762), under Seventh Circuit law, the definition is not limited solely to those actions involving a reduction in pay or benefits.  See Herrnreiter v. Chicago Hous. Auth., 315 F.3d 742, 744-45 (7th Cir. 2002). The Seventh Circuit has set forth the following three categories of cases which satisfy the criteria for adverse employment actions:

> (1) cases in which the employee's compensation, benefits or other financial terms of employment are diminished, including cases where employment is terminated; (2) cases in which a nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced; and (3) "[c]ases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the *conditions* in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment . . . ."

Tart v. Ill. Power Co., 366 F.3d 461, 475 (7th Cir. 2004) (quoting id.) (emphasis in original).

Here, Ms. Mink has not alleged, nor has any evidence been adduced from the record to prove, that Mr. Carpenter ever demoted her, denied her a promotion, reassigned her to a different job site, cut her benefits, docked or decreased her pay, gave her a negative performance review, or formally disciplined her.  However, Ms. Mink does contend that Mr. Carpenter took "innumerable" tangible employment actions against her,

including preventing her from using her electrician's skills and training, which stunted her career growth, and subjecting her to dangerous and humiliating working conditions.

According to Ms. Mink, in retaliation for her rejection of his sexual advances, Mr. Carpenter turned her into a "gofer" and assigned her desk work rather than electrician's tasks.  She testified by affidavit that, especially during the last six months that she worked under Mr. Carpenter, she "was exposed to the opposite of apprenticeship training" and her "learning stopped."  Mink Aff. ¶¶ 4-5.  Ms. Mink contends that, not only did Mr. Carpenter's behavior cause her skills to atrophy, which negatively affected her opportunities for career advancement in the field, it also exposed her to physical danger because, due to her inability to maintain her skill level, she was not adequately prepared to complete the jobs when Mr. Carpenter did assign her electrical work.

The Seventh Circuit has recognized that an official action that "change[s] the employee's job] in a way that injures his career" meets the standard for a tangible employment action, even if unaccompanied by a transfer.  Huff v. Sheahan, 493 F.3d 893, 901 n.11 (7th Cir. 2007) (quoting Herrnreiter, 315 F.3d at 744); accord LaFary v. Rogers Group, Inc., ___ F.3d ___, 2010 WL 92485, at *3 (7th Cir. Jan. 12, 2010).  Insofar as Ms. Mink is alleging that Mr. Carpenter's behavior interfered with or otherwise delayed the completion of her apprenticeship training, the evidence adduced in the record does not support that conclusion.  Ms. Mink completed the union apprenticeship program in July 2005, shortly after she began working with Mr. Carpenter, and from that point on was a journeyman wireman, not an apprentice.  Thus, there is no evidence to establish that Mr.

Carpenter's behavior affected Ms. Mink's apprenticeship training.

Ms. Mink also has not alleged that any alteration in her job duties or loss of skill resulted in immediate and direct harm to her career, such as a loss of promotion, formal discipline or a poor performance review.  Instead, she contends that in response to her rejection of his sexual advances, Mr. Carpenter began to assign her desk work rather than tasks that required her electrical skills, which caused her skills to atrophy and potentially hurt her future job prospects in the field.  However, in her deposition, she conceded that she often took on Mr. Carpenter's desk work in order to make up for the work she missed due to her frequent absences.  Mink Dep. at 165-66.  This testimony fails to demonstrate that any additional clerical duties taken on by Ms. Mink were the result of Mr. Carpenter's harassment, as opposed to some other agreed-upon arrangement between the two, unrelated to Mr. Carpenter's spurned advances.

Ms. Mink further claims that Mr. Carpenter materially changed the conditions of her employment by giving her a dangerous job assignment.  See Herrnreiter, 315 F.3d at 744 (holding that subjecting an employee to unsafe working conditions constitutes a tangible employment action).  Ms. Mink asserts that Mr. Carpenter subjected her to a tangible employment action when, in retaliation for her rejection of his sexual advances, he, on one occasion, purposefully assigned her to work with live electricity, which resulted in her receiving a serious electrical shock.  Unlike many professions, being an electrician necessarily involves a certain amount of danger due to the nature of the work.  Thus, to be an electrician, an individual must, at least to some extent, understand and

25

accept that there is a level of danger inherent in the job.  Nevertheless, even in professions

such as the electrical field, where a certain amount of danger is assumed, an excessively

dangerous work assignment could in some cases constitute a tangible employment action.

See Reed v. MBNA Marketing Sys., Inc., 333 F.3d 27, 33 (1st Cir. 2003) (observing that

"an extremely dangerous job assignment to retaliate for spurned advances" could be an

example of an official act).  However, the evidence does not support a finding that this

was the situation here.  Ms. Mink testified that she had complained to Mr. Carpenter that

he was not assigning her tasks that utilized her skills as a electrician.  The fact that, after

she requested more challenging work, Mr. Carpenter on one occasion assigned her just

such a project that she now contends was too difficult for her to safely complete, does not

demonstrate that the assignment was harassment constituting a tangible employment

action.[7]

    Ms. Mink also contends that Mr. Carpenter materially changed her job by making

humiliating and degrading alterations to the workplace conditions.  See Herrnreiter, 315

F.3d at 744 (noting that the "classic case" of this type of tangible employment action is

that of the employee whose desk is moved into a closet).  Specifically, she claims that Mr.

Carpenter grabbed her while she was on the roof of a building and pretended he was

---

[7] In her deposition, Ms. Mink testified that Mr. Carpenter "had been told by the office to
not work hot stuff anymore, but he did it anyway and asked me to do it" and that, following her
electrical shock, "he got some flack from the office for not following protocol, and probably for
working it hot in the first place."  Mink Dep. at 276.  However, beyond Ms. Mink's own
statement, there is no other evidence in the record that Mr. Carpenter had been so instructed or
disciplined.

going to push her over the edge, grabbed her from behind while she was working with live electricity and pretended he was going to push her into the circuit box, and shook a ladder on which she was standing approximately forty feet in the air.  If true, such behavior is obviously inappropriate and unwelcome, but none of these examples constitutes tangible employment actions because none fall(s) "within the special province of the supervisor."  Huff, 493 F.3d at 902 (citations omitted).  Each of the cited actions could have just as easily been taken by a co-worker as opposed to a supervisor, and thus, do not rise to the level of a tangible employment action for purposes of the Ellerth/Faragher analysis.

Alternatively, Ms. Mink alleges that Barth is strictly liable for Mr. Carpenter's conduct because the hostile work environment he created resulted in her constructive discharge.  In order to show that she was constructively discharged, Ms. Mink "must not only demonstrate that a hostile work environment existed but also that the abusive working environment was so intolerable that her resignation was an appropriate response."[8]  McPherson v. City of Waukegan, 379 F.3d 430, 440 (7th Cir. 2004) (citations omitted).  In other words, Ms. Mink must "establish that the intolerable work

---

[8] Ms. Mink did not officially resign or otherwise inform Barth that she was quitting. Instead, following the conclusion of Barth's investigation into her allegations of sexual harassment, she took FMLA leave.  As the end date of her FMLA leave of absence was approaching, Barth attempted to contact Ms. Mink to learn whether she was intending to return to work upon the expiration of her FMLA leave.  Because Ms. Mink neither contacted Barth nor returned to work, when her FMLA leave of absence expired on June 29, 2007, Barth converted her leave to a voluntary termination.  Because we find that Ms. Mink was not constructively discharged for other reasons detailed below, we assume for purposes of this ruling that Ms. Mink's silence and failure to return to work after her FMLA leave constitutes a "resignation."

conditions would lead a reasonable employee to quit." <u>Mckenzie v. Potter</u>, 2007 WL 684755, at *3 (7th Cir. Mar. 7, 2007) (citing <u>id.</u>; <u>Robinson v. Sappington</u>, 351 F.3d 317, 336 (7th Cir. 2003)).  The "[w]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress." <u>Robinson</u>, 351 F.3d at 336 (quotation marks omitted).

Barth concedes that, viewing the facts in the light most favorable to Ms. Mink for purposes of summary judgment, it may have been intolerable for her to remain working with Mr. Carpenter.  However, as discussed above, even if Ms. Mink were to succeed in demonstrating that she was constructively discharged as a result of Mr. Carpenter's harassment, Barth is still entitled to assert the <u>Ellerth/Faragher</u> affirmative defense unless Ms. Mink quit in response to an official act, or conduct involving a direct exercise of company authority.  <u>See</u> <u>Suders</u>, 542 U.S. at 134.  Because, for the reasons detailed above, we have found that Mr. Carpenter's alleged conduct was not official action, Barth cannot be subjected to strict liability for Mr. Carpenter's alleged conduct.

In the alternative, Ms. Mink also contends that Barth's offer to transfer her to another job site, such as the pre-fabrication department, in order to prevent her from having to work with Mr. Carpenter resulted in her constructive discharge.  Although Ms. Mink asserts that a transfer to the "warehouse" would have constituted a demotion, the facts adduced from the record do not support such a characterization of that position or transfer.  It is undisputed that, at the warehouse, Ms. Mink would have received the same

pay and benefits as she had received at the Mall.  The working conditions at the warehouse were also similar to the conditions that Ms. Mink had told Ms. Fahrbach made the Mall an ideal job site for her.  For example, at the warehouse, Ms. Mink would be working inside, in a climate-controlled environment, with accessible bathroom facilities. We are unable to find that this transfer would have made Ms. Mink's working conditions so intolerable that she would be forced into involuntary resignation.  See Roby v. CWI, Inc., 579 F.3d 779, 785 (7th Cir. 2009) ("[C]onstructive discharge occurs when an employer makes an employee's working conditions so intolerable that an employee is forced into involuntary resignation.") (citations omitted).

The case Ms. Mink cites in support of her contention that Barth's transfer offer led to her constructive discharge, Robinson v. Sappington, 351 F.3d 317 (7th Cir. 2003), is inapposite for comparison.  In Robinson, in order to prevent future harassment by plaintiff's employer (sadly, a judge), the plaintiff was transferred to work in a different judge's chambers.  However, when she was transferred, the presiding judge told the plaintiff that the judge to whose office she was being transferred "would make her life 'hell' for six months" and suggested that she resign rather than take the new position.  Id. at 337.  In the case at bar, however, Barth offered to transfer Ms. Mink to a location with amenities that she had requested and to a position where she would retain the same salary, benefits, and level of seniority.  We conclude that no reasonable jury could find that this proposed transfer would have made Ms. Mink's continued employment with Barth while

29

she sought redress intolerable.[9]

Because we find that Ms. Mink was neither constructively discharged nor otherwise subjected to a tangible employment action as a result of Mr. Carpenter's alleged harassment, we turn next to the Ellerth/Faragher affirmative defense analysis.

### B.    Ellerth/Faragher Affirmative Defense

As discussed above, in order to successfully assert the Ellerth/Faragher affirmative defense, an employer must demonstrate both that: (1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Ellerth, 524 U.S. at 765.  We address these requirements in turn.

### 1.    Reasonable Care to Prevent and Correct Harassment

Ms. Mink does not allege, nor does the evidence in the record establish, that Barth failed to exercise reasonable care to prevent sexually harassing behavior.  The company had both an anti-harassment policy as well as an established reporting mechanism in

___

[9] Ms. Mink nevertheless contends that it had become intolerable for her to work for Barth in *any* capacity due to Post-Traumatic Stress Disorder ("PTSD").  Even accepting Ms. Mink's description of her severe emotional distress as true, "[t]he [constructive discharge] inquiry is *objective*: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"  Suders, 542 U.S. at 141 (emphasis added).  For the reasons detailed above, we find that Ms. Mink has failed to make such a showing.

place, the details of which were communicated to all of its employees.  See, e.g., Shaw v.
AutoZone, Inc., 180 F.3d 806, 812 (7th Cir. 1999) (finding that the fact that the employer
had adopted a detailed anti-harassment policy that had been distributed to its employees
established, as a matter of law, that the employer exercised reasonable care to prevent
harassment).  Ms. Mink contends that Barth has nevertheless failed to meet its burden
under the first prong of the Ellerth/Faragher affirmative defense because it has failed to
show that it made a reasonable attempt after she complained either to investigate her
allegations or to take steps to remedy Mr. Carpenter's behavior and prevent future
harassment.

Under Seventh Circuit law, "[a]n employer's response to alleged instances of
employee harassment must be reasonably calculated to prevent further harassment under
the particular facts and circumstances of the case at the time the allegations are made."
Cerros v. Steel Techs., Inc., 398 F.3d 944, 953-54 (7th Cir. 2005) (quoting McKenzie v.
Ill. Dep't of Transp., 92 F.3d 473, 480 (7th Cir. 1996)) (emphasis removed) (internal
quotation marks omitted).  In other words, the employer must take "prompt and
appropriate corrective action reasonably likely to prevent the harassment from recurring."
Cerros, 398 F.3d at 954 (quoting Williams v. Waste Mgmt. of Ill., 361 F.3d 1021, 1029
(7th Cir. 2004)).  The Seventh Circuit has recognized that "prompt investigation of the
alleged misconduct" is "a hallmark of reasonable corrective action," and, alternatively,
that the absence of such an investigation may signal a failure to meet the standard.  Id.
(citations omitted).

31

It is undisputed that, following receipt of Ms. Mink's complaint, Ms. Fahrbach immediately reported the allegations to Mr. Barth and Mr. Arthur and, on the next work day, commenced an investigation into the alleged harassment.  Ms. Mink contends that, despite having immediately conducted an investigation, Barth nevertheless failed to exercise reasonable care to correct any sexually harassing behavior because its investigation was inadequate in scope, rendering its conclusion at the end of the investigation "totally flawed."  Pl.'s Resp. at 23.  Specifically, Ms. Mink complains that Barth's investigation consisted only of brief interviews of Mr. Carpenter and Mr. Davis in a public space at the Mall and one or two telephonic interviews with her, during which she was not asked whether she had any evidence in her possession to corroborate her allegations.  According to Ms. Mink, because she had made serious allegations, including that Mr. Carpenter had physically assaulted her, Barth should have conducted a more thorough investigation.  She contends that, if it had, it would have discovered that she had in her possession over eighty emails she had exchanged with Mr. Carpenter, two of which include her request that Mr. Carpenter stop harassing her.

It is well established under Seventh Circuit law that, in evaluating the reasonableness of an employer's response, the court must consider the gravity of the alleged harassment.  Cooper-Schut v. Visteon Auto. Sys., 361 F.3d 421, 426 (7th Cir. 2004).  Thus, in assessing the adequacy of the investigation and remedial steps taken by Barth to address Ms. Mink's allegations, we must remain mindful that, at the time the investigation was conducted, Ms. Mink had reported only the following: that Mr.

Carpenter tickled her, shook ladders when she was on top of them, and once tried to put his hand down her shirt.  The much more extensive and egregious allegations included in Ms. Mink's deposition, affidavit, and attachment to her EEOC charge were never reported to Barth during the time she was employed by the company.[10]

In response to Ms. Mink's allegations, Barth's President and EEO officer both went to the Mall to conduct separate interviews of Mr. Carpenter and Mr. Davis, the only other Barth employee working at that job site.  During his interview, Mr. Carpenter denied the allegations and played several voicemail messages he had then recently received from Ms. Mink in which she reported that she would be unable to make it to work on several separate occasions for various reasons.  In a separate interview, Mr. Davis stated that Mr. Carpenter engaged in horseplay around the job site, which annoyed Ms. Mink,[11] but when asked about sexual harassment, he described only two incidents, both of which involved Ms. Mink, not Mr. Carpenter, making sexually-charged comments or jokes.  The mere fact that Barth conducted these interviews in a public location, while perhaps atypical, does not, without more, demonstrate that the investigation was inadequate.

---

[10] Ms. Mink had made no complaints to the OFCCP investigator either.

[11] In fact, Mr. Davis told Ms. Fahrbach and Mr. Barth that Mr. Carpenter was a "jokester" who often pinched, not only Ms. Mink, but Mr. Davis himself on the leg while on a ladder. Thus, much of the harassment that Ms. Mink reported to Barth does not appear to relate to Ms. Mink's sex, given that Mr. Carpenter reportedly acted in many instances in the same way toward both sexes.  Ms. Mink does not refute this evidence.  Inappropriate conduct that is inflicted on both sexes, or is inflicted regardless of sex, is outside the ambit of Title VII.  Holman v. Indiana, 211 F.3d 399, 403 (7th Cir. 2000).

Ms. Mink also faults Barth for failing to discover that she had in her possession a significant amount of email correspondence which she contends reveals "a complex and unprofessional relationship between a supervisor and employee," (Pl.'s Resp. at 23), and shows that she had asked Mr. Carpenter on two occasions to stop harassing her. She argues that, had Barth only interviewed her for a longer period of time, it would have learned of the emails. However, it is undisputed that Ms. Mink was aware of these emails, had them in her possession, and yet never told anyone at Barth that they existed, either when she made her initial complaint, or subsequently when Ms. Fahrbach told her that, after interviewing Mr. Carpenter and Mr. Davis, she (Fahrbach) viewed the situation as a "he said-she said" situation. There is also no indication that Barth would have otherwise had access to these emails by any other means because the accounts used by Ms. Carpenter and Ms. Mink appear to have been their personal, rather than work, accounts. Ms. Mink had ample opportunity to present these emails to her employer in support of her allegations and has put forth no explanation for having failed to do so. Thus, the fact that, for some unknown reason, she chose not to share the emails with Barth cannot now be used as evidence that the company failed to conduct an adequate investigation.

Because Ms. Mink did not inform Barth of the emails which might have bolstered her claims, based on the information Barth had in its possession following its investigation, the situation was, as Ms. Fahrbach told Ms. Mink, basically a "he said-she said" kind of situation. Under such facts, we cannot say that Barth was required to credit

34

Ms. Mink's allegations over those of Mr. Carpenter or Mr. Davis, the only other Barth

employee who worked at the job site.  Nor can we discern that Barth ignored any

additional avenues at that time that it could have or should have investigated.

Accordingly, we find that Barth took reasonable care to prevent and investigate

harassment.


### 2.    Failure to Take Advantage of Protective and Corrective Opportunities

The only remaining issue is whether Ms. Mink "unreasonably failed to take

advantage of any preventive or corrective opportunities provided by the employer or to

avoid harm otherwise."  Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807.  It is

undisputed that Barth had in place an anti-harassment policy that prohibited sexual

harassment and included a complaint procedure which instructed employees to

immediately report harassment to Mr. Barth, Mr. Arthur, or Ms. Fahrbach.  Ms. Mink

concedes that she was aware of both the policy and the reporting mechanism, yet, despite

the harassment's alleged continued escalation, she failed to report Mr. Carpenter's

conduct to Barth until approximately two years after it allegedly began.  See Faragher,

524 U.S. at 807-808 ("[W]hile proof that an employee failed to fulfill the corresponding

obligation of reasonable care to avoid harm is not limited to showing an unreasonable

failure to use any complaint procedure provided by the employer, a demonstration of such

failure will normally suffice to satisfy the employer's burden under the second element of

the defense.").  It is well-established under Seventh Circuit law that employers may be entitled to summary judgment based on the <u>Ellerth</u>/<u>Faragher</u> affirmative defense in cases where there has been a much shorter delay between the alleged harassment and the plaintiff's first complaint.  <u>See, e.g.</u>, <u>Jackson v. County of Racine</u>, 474 F.3d 493 (7th Cir. 2007) (employer entitled to summary judgment on affirmative defense where plaintiff waited four months to report harassment); <u>Gawley v. Indiana Univ.</u>, 276 F.3d 301 (7th Cir. 2001) (employer entitled to summary judgment on affirmative defense due to seven month delay between harassment and plaintiff's complaint).

Ms. Mink contends that her delay in reporting Mr. Carpenter's harassment was not unreasonable in light of the circumstances because she was under severe emotional and psychological distress as a result of the harassment to which she contends she had been subjected on a regular basis.  However, we find that Ms. Mink's failure to complain at any point during the two years of what she alleges was continuously escalating harassment, coupled with the insufficiency of her informal attempts to end Mr. Carpenter's behavior by asking him to stop in person and via email, constitute an unreasonable failure to take advantage of Barth's corrective procedures.  <u>See Gawley</u>, 276 F.3d at 312 ("[Plaintiff's] neglect of the university's formal procedures during seven months of escalating harassment, in combination with the insufficiency of her repeated informal efforts to stop [her harasser] constitute an unreasonable failure to take advantage of the university's corrective procedures.").  Ms. Mink's failure to report Mr. Carpenter's conduct until approximately two years after she alleges it began denied Barth an

opportunity to remedy the situation at any earlier point.

Ms. Mink's arguments that her fear of Mr. Carpenter[12] and her fear that she would lose her job as result of reporting justify her delay are not persuasive in light of the following facts: According to Barth's reporting procedure, the victim is not required to confront the offender and is instead instructed to immediately report harassment directly to Ms. Fahrbach, Mr. Arthur, or Mr. Barth.  Thus, Ms. Mink would not have had to confront Mr. Carpenter in order to report his conduct.  With regard to her fear that she would lose her job as a result of reporting the harassment, Ms. Mink had on two previous occasions reported harassment by other supervisors to Barth and retained her job, albeit at a different job site, with all the same material terms and conditions of employment.

For the foregoing reasons, we find that Barth has demonstrated that with respect to Barth's response to Ms. Mink's complaints against Mr. Carpenter there is no issue of material fact and that, as a matter of law, Barth is entitled to the Ellerth/Faragher affirmative defense.  Accordingly, we GRANT Barth's Motion for Summary Judgment on this issue.


## II.     Retaliation

Under Title VII, it is unlawful "for an employer to discriminate against any of [its]

---

[12] Elsewhere in the record, Ms. Barth testified that, because Mr. Carpenter had been nice to her in the past, she delayed reporting his conduct because she felt she owed him something. This alternative explanation for the delay does not justify her failure to report the harassment.

employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). A plaintiff has two methods of proof available to her to demonstrate retaliation. A plaintiff may prove retaliation either through the direct method of proof or the indirect method, also called the "burden-shifting" method. Moser v. Ind. Dep't of Corr., 406 F.3d 895, 903 (7th Cir. 2005). There is no indication regarding which method Ms. Mink intends to rely upon to prove her retaliation claim because she fails to address this claim in her response brief. However, in order to successfully prove retaliation under either method of proof, Ms. Mink would need to demonstrate, *inter alia*, that she suffered an adverse employment action.

In her complaint, Ms. Mink alleges that, after she reported Mr. Carpenter's harassment to Ms. Fahrbach, Barth retaliated against her by transferring her away from her position at the Mall to an allegedly less desirable position in a warehouse. The evidence adduced from the record, however, shows that Barth never actually transferred Ms. Mink following her complaint, but rather merely offered her a transfer to a comparable job site as one option for addressing the situation. Before the offer was accepted or any other decision was made regarding her employment, Ms. Mink took FMLA leave after which she failed to return to work; the transfer thus never actually occurred. In its briefing on this motion, Barth contends that, because this unaccepted

38

offer resulted in no material harm,[13] it does not constitute an adverse employment action within the meaning of Title VII's anti-retaliation provisions.  See, e.g., Ajayi v. Aramark Bus. Servs., Inc., 336 F.3d 520, 531 (7th Cir. 2003) ("An unfulfilled threat, which results in no material harm, is not materially adverse.").

In her brief in response to Barth's summary judgment motion, Ms. Mink completely fails to respond to this argument or otherwise address the merits of her retaliation claim and, thus, is deemed to have waived this issue.  See Keller v. Indiana Family and Social Servs. Admin., 639 F. Supp. 2d 928, 944 n.10 (S.D. Ind. 2009) (Barker, J.).  Accordingly, we GRANT Barth's Motion for Summary Judgment on Ms. Mink's retaliation claim.

## III.    Conclusion

For the foregoing reasons, we GRANT Defendant's Motion for Summary Judgment and DENY AS MOOT Defendant's Motion to Strike.  Final judgment shall be entered accordingly.

IT IS SO ORDERED.

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Date:    02/02/2010

---

[13] We note that, even if Ms. Mink had been transferred to the warehouse, it is questionable whether she could have been able to show that such a transfer constituted a demotion as opposed to merely a lateral transfer, as she would have retained the same pay and benefits.

Copies to:

Jeffrey Stuart Ankrom
BERRY & DOMER
ankrom@copyrighttimes.com

Thomas Allen Berry
BERRY & DOMER
tom@tomberry.com

Anne L. Cowgur
BINGHAM MCHALE LLP
acowgur@binghammchale.com

Donald  Francis Jr.
701 N. Walnut Street
Bloomington, IN 47404

Jeffery M. Mallamad
BINGHAM MCHALE LLP
jmallamad@binghammchale.com

Robert C. Price
PRICE & RUNNELLS
robertcprice@att.net

Mary M. Runnells
PRICE & RUNNELLS
mrun4@att.net

Christopher R. Taylor
BINGHAM MCHALE LLP
ctaylor@binghammchale.com